IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                    Criminal No. ELH-17-0322

THOMAS MERRICK,
*Defendant*.

**MEMORANDUM OPINION**

Defendant Thomas Merrick, who is now self represented, filed a motion for reduction of sentence, pursuant to 18 U.S.C. §§ 3582(c)(1)(A).  ECF 490 (the "Motion").[1]  In particular, he seeks a sentence reduction of 10 months.  *Id.* at 2, 3.  Defendant asserts that he has had "complications with [his] breathing," and his "mom and pop is up in age . . . ."  *Id.* at 3.[2]

The government opposes the Motion.  ECF 496.  And, it has submitted several exhibits.  The defendant did not reply.  *See* Docket.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

**I.      Background**

Defendant was one of eleven people charged in a Superseding Indictment filed on September 6, 2017.  ECF 21.  In particular, Merrick was charged in Count One with conspiracy to

---

[1] The defendant also seeks relief under something he calls the "Hardship Act," which he claims "became law on January 15, 2023 . . . ."  ECF 490 at 1.  As the government points out, no such statute exists.  *See United States v. Wesley*, Case 17CR32, 2023 WL 3204027, at *2 (N.D. W. Va. May 22, 2023).

[2] The Office of the Federal Public Defender has declined to supplement the Motion and does not seek appointment as counsel.  ECF 492.

distribute and possess with intent to distribute both heroin and fentanyl, in violation of 21 U.S.C. § 846.

On April 2, 2018, the defendant entered a plea of guilty to Count One.  ECF 148.  The plea was tendered pursuant to a plea agreement.  ECF 145.

In the plea agreement, the defendant stipulated that he was a member of a drug conspiracy involving the distribution of 400 grams or more of fentanyl and one kilogram or more of heroin. ECF 145 at 8.  The evidence establishing the defendant's guilt included a wiretap investigation, surveillance activities, including at a stash location in Baltimore, and other evidence.  *Id.* During the wiretaps, the defendant was monitored engaging in drug-related communications with another member of the conspiracy, referred to as CC-1.  *Id.*  CC-1 would obtain narcotics and would arrange with other members of the conspiracy, including Merrick, to store and distribute the narcotics to customers.  *Id.*

In the plea agreement, the parties anticipated that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), defendant had an offense level of 34, prior to three deductions under U.S.S.G. § 3E1.1.  *Id.* ¶ 6.  The government agreed to recommend a sentence based on the sentencing factors in 18 U.S.C. § 3553(a).  *Id.* ¶ 9.

The Presentence Report ("PSR," ECF 180) reflected that defendant was 37 years of age at the time of sentencing.  *Id.* at 3.  He had a final offense level of 31.  *Id.* ¶ 32.  And, defendant had a criminal history category of VI.  *Id.* ¶ 45.  Based on an offense level of 31 and a criminal history category of VI, the Guidelines called for a sentence ranging from 188 to 235 months of imprisonment.  *Id.* ¶ 83.

The government sought a sentence of 156 months, *i.e.*, thirteen years of imprisonment. ECF 206 at 1, 8, 9.  On July 16, 2018, the Court sentenced the defendant to a below Guidelines sentence of 138 months of imprisonment, with credit dating from November 13, 2017.  ECF 209.

Defendant, who is now 43 years of age, is incarcerated at Hazelton FCI.  *Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/# (search by BOP Register Number 63524-037) (last accessed August 20, 2024).  He has a projected release date of September 29, 2027.  *See id.*

## II.    Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Davis*, 99 F.4th 647, 653 (4th Cir. Apr. 18, 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a

reduction." *Hargrove*, 30 F.4th at 194; *see United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release . . . .").

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the BOP rarely filed such a motion on an inmate's behalf. As a result, compassionate release was an infrequent occurrence. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

However, with the passage of the First Step Act ("FSA") in 2018, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582, *Malone*, 57 F.4th at 173, by enabling a federal inmate to file a motion for compassionate release directly with the court, as long as the inmate first exhausted administrative remedies. *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020). In particular, the FSA authorized a court to grant compassionate release "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to

bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. Specifically, "the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.

The first step actually has two parts. The court "must determine: 1) whether extraordinary and compelling reasons warrant . . . a [sentence] reduction; and 2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *see Davis*, 99 F.4th at 653; *Bond*, 56 F.4th at 383; *Bethea*, 54 F.4th at 831; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).

If that first step is met, the court then proceeds to the second step. Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647; *Kibble*, 992 F.3d at 330. "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman*, 2024 WL 3633573, at *4 (citations omitted) (alteration in *Osman*); *see Malone*, 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and

compelling reasons warrant a sentence reduction and that a reduction is consistent with the Sentencing Commission's policy statements).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647. Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 653–54.

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners. *Davis*, 99 F.4th at 654; *see McCoy*, 781 F.3d at 281. The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021) (emphasis added). Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 281, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." As a result, district courts were "empowered . . . to consider any

extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted).

However, effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is now applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction").[3] As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).

The Policy Statement provides, in part, U.S.S.G. § 1B1.13:

(a) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

---

[3] Defendant's Motion was filed on November 1, 2023, the effective date of the amendments.

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS." It identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as a terminal illness, "serious cognitive impairment," a medical condition that requires "specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency . . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, § 1B1.13(b)(4)(A), (B); for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed . . . .", § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." § 1B1.13(b)(5).

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c).

8

"However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 99 F.4th at 654.[4]

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant. It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence. The Section provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d). But, it adds that "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57

---

[4] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500. However, the Court acknowledged that "Congress or the Constitution [may] limit[] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence . . . ." *Id.* at 486. "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495. It follows that, because the Policy Statement is now applicable to prisoner-filed motions for compassionate release, a court may consider intervening changes of law only in the manner that the Policy Statement prescribes.

F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors, to the extent applicable, in exercising its discretion); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors). Notably, the amendments to the Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor." *Davis*, 99 F.4th at

656; *see United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021).  And, in weighing the §
3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384–85.

      In *Davis*, 99 F.4th at 659, the Fourth Circuit said:  "District courts are not required to
acknowledge and address each of the defendant's arguments on the record when conducting a §
3553(a) analysis."  But, "'the record as a whole'" must demonstrate that the judge considered the
parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*,
57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023
WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).  In particular, "the court must provide
an explanation sufficient 'to allow for meaningful appellate review' in light of the particular
circumstances of the case."  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28,
2022) (per curiam) (quoting *High*, 997 F.3d at 190).  And, a district court abuses its discretion
when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors
constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or
"commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see
Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory"
consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

      "How much explanation is 'enough' depends on the complexity of a given case."
*Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir.
2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing
mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v.
Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at
190) (alterations in *Cohen*).  And, a more detailed explanation may be required if a substantial
change in the law creates a disparity between the sentence a defendant actually received and the

sentence he would receive, if sentenced under current law. *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."). In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . . " *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

*Davis*, 99 F.4th 647, is illustrative. The *Davis* Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6). *Id.* at 654, 655. And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661. According to the Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.* The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)). The Court concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial." *Davis*, 99 F.4th at 661 (*citing Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)).

### III.   COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[5]   *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).[6]   Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.   *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).   Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.   That declaration was extended on several occasions.   *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years."   *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."   *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).   Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious.   *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.   As the Fourth Circuit has put it,

---

[5] The Court may take judicial notice of matters of public record.   *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.   *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

**B.**

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.*  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing."  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, Ctrs. for Disease Control & Prevention (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting.  *Seth*, 461 F. Supp. 3d at 248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. Times (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* Wash. Post (Aug. 24, 2020),

https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 461 F. Supp. 3d at 248.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of an illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW. It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020. And, the virus, too, has changed repeatedly, with multiple strains and variants. As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States. Alexander Tin, *Biden Says*

*Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic." Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent. *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated August 3, 2024). Available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, N. Y. TIMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated March 26, 2024). But, a new "summer covid wave" has emerged, leading "[c]oronavirus activity in wastewater [to] reach[] levels considered 'high' or 'very high' in 26 states."  Fenit Nirappil & Lizette Ortega, *Covid Summer Wave Spreads Across U.S., Even Infecting Biden*, WASH. POST (July 18, 2024), https://perma.cc/JC8B-29AR.

## IV.   Discussion

### A. Exhaustion

The government asserts that defendant has not satisfied the exhaustion requirements of the compassionate release statue.  ECF 502 at 2.

Under 18 U.S.C. § 3582(c)(1)(A), a court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has

fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  Once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

In *United States v. Muhammad*, 16 F.4th 126 (4th Cir. 2021), the Fourth Circuit made clear that, under a plain reading of the statute, a defendant need only wait until the 30 days have passed from receipt of his compassionate release request by the warden to directly petition the court.  *Id*. at 129.  "The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days after the warden receives his request, regardless of whether the defendant exhausted his administrative remedies." *Id*.  Thus, the term administrative "exhaustion," although commonly used, may to some extent be a misnomer.  In any case, the statute is clear that, at the very least, the defendant must have directed a compassionate release request to the warden before filing such a request in court.  *See McCoy*, 981 F.3d at 276 (noting that "defendants now may file motions for sentence modifications on their own behalf, *so long as they first apply to the BOP*.") (emphasis added).

The Fourth Circuit also clarified in *Muhammad*, 16 F.4th at 130, that this administrative requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. This means that it can be "waived if it is not timely raised." *Id*. at 129.  Here, however, the government has raised the issue.

21

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (4th Cir. 2023).  Defendant has not replied, and thus he has not refuted the government's allegations.

There is no indication that the defendant has exhausted his administrative remedies with the BOP.  However, the matter is not jurisdictional.  I shall assume, *arguendo*, that exhaustion is satisfied.  This is because defendant filed his Motion on May 26, 2023, but the Court was unable to consider the Motion in a more timely fashion, due to the press of other business.  If the Court had acted more expeditiously, defendant could have cured the exhaustion defect.  Under these circumstances, it would be inequitable to now require the defendant to begin the process anew.  Therefore, I will proceed to the merits.

## B.  The Merits

The defendant asserts, in general, that he experienced harsher conditions of confinement due to COVID-19; that he had to quit his BOP job due to COVID-19; and he lost family due to COVID-19.  ECF 490 at 1-2.

However, as the government observes, the defendant has not claimed any particular health condition that exposes him to a specific risk associated with COVID-19.  ECF 502 at 5.  Moreover, the government has obtained the defendant's BOP medical records. *See* ECF 502-2; ECF 502-3; ECF 502-4.  They do not reflect any medical conditions that warrant a reduction of defendant's sentence.

I also agree with the government that "the defendant's claims are vague, unsupported by any medical records, and do not establish any basis for reduction of sentence under COVID-19." ECF 502 at 5.  And, courts have rejected § 3582(c)(1)((1) claims based on generalized fears

relating to COVID-19.  *See*, *e.g.*, *United States v. Harris*, DKC-08-0319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020) (rejecting § 3582(c)(1)(A) motion based on "generalized and unspecific reasons").

In sum, the defendant has not cited any ground that would support a finding of an extraordinary and compelling reason for compassionate release.

Even if defendant had established extraordinary and compelling circumstances, that would not end the inquiry.  The Court would then have to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) in deciding whether to exercise its discretion in favor of release.[7]  These factors include:  (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

I agree with the government that the sentencing factors do not weigh in favor of a reduction of sentence.

First, the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1)) support the current sentence.  The defendant was a member of a conspiracy to distribute two dangerous and deadly drugs: fentanyl and heroin.  The quantities involved in the conspiracy – an intended quantity of 400 grams of fentanyl and one kilogram of heroin – were quite substantial.  The distribution of opioids like fentanyl and heroin is inherently dangerous and warranted a substantial sentence.

---

[7] Defendant does not discuss the sentencing factors.

The government concedes that the defendant was not a supervisor or leader in the drug organization.  ECF 502 at 8.  Nevertheless, the stipulated facts indicate that defendant had a substantial role in the criminal conspiracy.[8]

That second § 3553(a)(1) factor – the defendant's personal history – is troubling, and weighs against release or reduction.  Defendant committed auto theft as a juvenile.  *See* ECF 180, ¶ 34.  As an adult, defendant incurred eight criminal convictions between 1999 and 2008.  *Id.* ¶¶ 36-44.  His criminal history also included several violations of probation.  *See id.* ¶¶ 39, 40.

The offenses included a felony drug offense at age 18 (*id.* ¶ 36); an assault and a handgun offense (*id.* ¶ 37); a sex offense; and unauthorized use of a motor vehicle.  On several occasions, sentences of incarceration were imposed.  *See*, *e.g.*, *id.* ¶¶ 36, 37.  On other occasions, the courts were lenient at the outset.  *See*, *e.g.*, *id.* ¶ 40.  Neither approach deterred defendant from continuing his criminal misconduct.

The defendant's BOP disciplinary history reflects only one disciplinary violation, which occurred in 2019.  But, it was for fighting, which is serious.  *See* ECF 502-5.

I am also mindful that the Court imposed a sentence well below the bottom end of the Guidelines.  It was also well below the sentence requested by the government.  As I see it, a reduction would not promote respect for the law.

---

[8] In its sentencing memorandum (ECF 206), the government described the defendant's role, comparative to his co-defendants', as follows, *id.* at 5-6:

> Certainly, the defendant was less culpable than some of his co-defendants, such as the top defendants in the case.  But the defendant had a higher level of responsibility than some other accomplices.  Indeed, the stipulated facts indicate that the defendant was assisting Antoine Harris in the operation of the organization.  The government would not call Merrick a leader or manager; but his role was substantive and significant.  The sentence should reflect that he was not a top player, but also not a bottom or minor player either.

In sum, the sentencing factors do not support a reduction of defendant's sentence.

### IV.    Conclusion

For the foregoing reasons, I shall deny defendant's Motion (ECF 490).

An Order follows, consistent with this Memorandum Opinion.

Date:  August 20, 2024                                         _____/s/_____
                                                                              Ellen Lipton Hollander
                                                                              United States District Judge